He is to announce that we have an admission ceremony to start with. Mr. Chan, will you approach the podium? And I invite Judge Chen to make a motion, if he wishes. Yes, I do wish to. Judge Newman, thank you very much. It is my pleasure to move the admission of Huggum Chan, who is a member of the Bar and is in good standing with the highest court of New York and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. I know these things about Mr. Chan because he has been serving as one of my clerks for the past year, and he has served with great distinction, and he's an excellent lawyer with great judgment. He clerked on the D.C. District Court for Judge Walton, so he comes already with a lot of experience, and I'm quite confident he is going to be a great member of our court's Bar. So I urge that you grant my motion. Well, thank you, Judge Chen. The panel will take a vote. I second the motion. You vote. And we have, I guess we have your vote. Yes, I'm on the same side. And it's my great pleasure to join the vote and to welcome you to the Bar. Please approach the clerk who will administer the oath. Do solemnly swear that you will report yourself as an attorney and counselor of this court, but rightly, according to law, that you will support the Constitution of the United States of America. Again, congratulations. Welcome to the Bar. Okay. Welcome, Mr. Chen, to the Bar. Okay. We shall proceed with the argument case for this afternoon. Pulido against Mattel. Mr. Picon. Thank you, Your Honor. Your Honor, I have a trial aid. It is a copy of the citations that I'll be referring to in my oral argument. If the court would like to accept it. No, I didn't hear you speak up a little. I have a trial aid. It's a document that contains the citations that I'll be referring to in my oral argument today. Are they pages from the appendix in this case? No, they're not. They just refer to, for example, the regulations that I'll be referring to. It gives the regulation number and a brief clip from the actual text of the regulation, for example. Let's accept them for the purpose of proceeding with the argument. And then if we find some flaw, we'll let you know. Very good. May it please the court. My name is Luke Piconi. I'm here today representing Mr. Richard Pulido, who over the last three months I've determined is a fine fellow who finds himself in unfortunate circumstance. Mr. Pulido surrendered his law license in North Carolina after having been charged with not using attorney funds the way he was supposed to. Since Mr. Pulido gave up his license, he came across a case from the North Carolina Supreme Court that completely justified his actions. And so when the reciprocal revocation proceedings took place at the Patent Office, Mr. Pulido sought to contest those proceedings because he knew that he had a strong argument that he was actually innocent during the North Carolina proceedings. But what is the status in North Carolina? Is any sort of independent action ongoing there to challenge that? He surrendered his license in North Carolina. He surrendered. He conceded. He admitted the wrongdoing. And what we need to know is what qualifies some other entity to second guess what happened in North Carolina. If he was disbarred in North Carolina or agreed to disbarment, then where are we? We believe that the Patent Office came into possession of exculpatory information that should have led the Patent Office officials who were hearing this case to conclude that Mr. Pulido was actually innocent. I realize this is the heart of your argument, but I just wanted to interrupt with a procedural question before you get too far along. Did you give a copy of your trial aid to the government's attorney? I did. Go ahead, I just wanted to make sure. I did, before we started. What is the exculpatory evidence you think the agency has? Mr. Pulido believes that the investigatory file prepared by the North Carolina Bar was provided to the Patent Office as a part of the package that they transferred between Bar authorities before the Patent Office started its disciplinary proceedings against Mr. Pulido. Maybe I wasn't clear. Is there some specific piece of evidence that you believe is exculpatory that somehow makes what Mr. Pulido confessed to actually make him innocent of what he confessed to? We do. What is that? It's an assignment, Your Honor. Mr. Pulido took $16,000 on behalf of a client who had been in an automobile accident, who had suffered serious injuries and who had undergone medical treatment to treat the medical condition as a result of the accident. He took that money and he took his fee, which he'd earned, which North Carolina allows for, and he gave the remainder of the balance of the money to the his client. This is not an instance where Mr. Pulido was considered to have stolen client funds. Instead, does Mr. Pulido have a copy of that assignment? He does not. He believes that the State of North Carolina had it. It's in the State of North Carolina investigatory file and that that file was provided to the Patent Office. Was it an assignment to Mr. Pulido? No. The funds arguably should have gone from Mr. Pulido, instead of to his client who suffered the injuries, to the person who paid for the medical treatment, which was, according to my understanding, the State of North Carolina. He did not give the funds to the State of North Carolina. He gave the funds to his client, and the State of North Carolina took issue with that disbursement. So the client actually received the funds. The State of North Carolina said that the funds should have gone to the State. Let's start with something maybe more fundamental. Why did Mr. Pulido consent to what he consented to? Why did he sign an affidavit acknowledging that he had engaged in attorney misconduct? And then why did he voluntarily give up his license, and why did he sign the consent order along with his attorney, Mr. Schneider, also signing this consent order of disbarment of the Superior Court of North Carolina? It's my opinion that Mr. Pulido was coerced into signing that consent order. In particular, a third party approached his parents and told him he would be imprisoned for 20 years if he did not sign the consent order. Is this the first time we're hearing this? Because I don't know if I saw that in any of the papers. It's not in the documents. I'm just answering your question, Your Honor. Okay. Is there a reason why Mr. Pulido hasn't gone back to the North Carolina Superior Court to ask to undo the consent order in light of new and material information? It's my understanding he intends to. And so as a preliminary step to that action, he wants to get the investigative file from North Carolina through the Patent Office officials, who are apparently Let me understand something. So, okay, Mr. Pulido, he told you that he was coerced in the most serious way. He didn't tell me he was coerced. He told me that somebody told his parents that he would be incarcerated for 20 years by North Carolina authorities if he refused to surrender his license. Did anybody tell this to the PTO? I don't know that it got to that point. I believe Mr. Pulido believed that the PTO was dealing with him in such bad faith. As I understand it, Mr. Pulido never filed a response to the disciplinary notice, right? The PTO gave him, I don't know, something like 40 days, and then he asked for an extension. It was granted. And then at the due date, at the end of that extension, he needed another extension. And then he got that. That's correct. And then at that point, but ultimately after, I don't know, several months, he just never filed a response. So the PTO, at a minimum, had no idea about this serious allegation that you're telling us now about. Well, I think Mr. Pulido had requested exculpatory information from the Patent Office. Would the Patent Office know about this threat to Mr. Pulido's parents? I don't know, Your Honor. How would they, I guess, is what I'm wondering. Well, in reciprocal disciplinary proceedings, the Patent Office doesn't give the disciplinary defendant much opportunity to really do anything unless the disciplinary defendant can show a denial of due process in the underlying state proceedings. So I don't know that it ever got to the point where Mr. Pulido was able to actually address that issue. But the record doesn't show, or this is a question, any proffer of anything other than, well, maybe we'll find something exculpatory. Well, Your Honor, it's my position that under the USPTO regulatory framework, whenever these proceedings come about, the attorneys at the USPTO are obligated to disclose this information, regardless of the nature of the proceedings, whether they're reciprocal discipline in the case of an attorney who surrendered his license or not. This is based on the Brady argument that you have in the briefs? No, it's not just based on the Brady argument. The Brady argument is very narrow, Your Honor. The Brady argument only considers the Brady v. Maryland case. There's two other overlapping areas of law that also dictate that the Patent Office is supposed to disclose exculpatory evidence. For example, 37 CFR 11.801 says that a practitioner in connection with a disciplinary matter shall not fail to disclose the fact necessary to correct a misapprehension known by the person to have arisen in the matter. If the Patent Office was under the misapprehension that Mr. Politti was guilty when they had exculpatory information... They have an affidavit in which he concedes to the state of North Carolina without reservation that what he's charged with is grounds for disbarment. So certainly there is some sort of presumption that he must overcome, is there not? Maybe, Your Honor. But in criminal cases, false confessions, coerced confessions, confessions that are not quite right for any number of reasons are routine. There's a case up in New York, the Central Park jogger case, which held the headlines for years because seven young men pleaded guilty to raping a young woman in Central Park. And after more than a decade in prison, it was discovered that somebody else had perpetrated the crime based on DNA evidence and a confession, and that these seven confessions from these young men... You're not saying this is analogous? I'm saying it's analogous because in this circumstance, in these particular facts, and in view of North Carolina Supreme Court case law, in which a significant dissenting portion of the court found that circumstances exactly analogous to Mr. Politis were what North Carolina mandated. If there is in the investigative file from North Carolina that is apparently in the possession of the PTO, and admission by the North Carolina authorities, hey, Mr. Politis probably would have won if this case had been heard on the merits. Can't he go to North Carolina at this stage and seek a reversal and say I was coerced into confessing and so on, and now I have counsel who is more attuned to the needs or whatever? Yes, Your Honor, and he intends to do that. As a preliminary step before doing that, he wants to develop any argument that he may have... It seems a little weird, though, to be going through the Patent Office to get the North Carolina file for use in a proceeding that's in North Carolina. Why wouldn't Mr. Politis go to North Carolina for any exculpatory evidence? It seems to me whatever doctrine that would apply here for saying the PTO should turn over exculpatory evidence would apply equally, if not more, in North Carolina to bar proceedings and disbarment proceedings if you're seeking to reopen them. Federal law differs from North Carolina law in a number of significant respects, Your Honor. The Freedom of Information Act, the Privacy Act, which are both federal laws, demand that the PTO disclose the information that Mr. Politis is requesting. But no one says that they have the information. I gather that what is needed is through this action to get whatever is in the North Carolina files, not what's in the PTO files. Well, the documents in the North Carolina file are also in the PTO's files. How do you know that? Because in this reciprocal proceeding, as I understand it, the Patent and Trademark Office finds out about the disbarment proceeding in North Carolina and the disbarment and then takes reciprocal action unless Mr. Politis is able to satisfy certain criteria, which he would have the burden of showing. There seems to be an assumption that the PTO has received some voluminous file from North Carolina. How do you know that's so? I can't be sure, but it makes sense that before taking the grievous action against an individual's right to pursue his chosen profession, which we know from Supreme Court case law is a liberty interest, the Patent Office would do some preliminary investigation with its large staff of attorneys. Is there anything it would need more than the three pages? Page one, Affidavit of Surrender submitted by Mr. Politis to the North Carolina Superior Court, and then pages two and three, the consent order of disbarment that he co-signed with the Deputy Counsel for North Carolina State Bar. I mean, it's all right here where he admits he engaged in professional misconduct warranting disbarment. I think that's all the PTO needs to get the ball rolling on a reciprocal disciplinary action. But is that all the PTO has? That's the issue here. Mr. Politis requested exculpatory information during a PTO proceedings to remove his license to practice law. That's a significant deprivation of a liberty interest. So the argument that I saw that was being raised below was a Brady argument. I mean, you're referring to some unnamed North Carolina State Supreme Court opinion, and the more I hear you talk, it might actually be the dissenting opinion that you're referring to. And I don't remember seeing that in your briefing to us or being discussed at the EDVA below or anything that was submitted in the record to the PTO. So is this something new? It is a citation to case law that is relevant to the case. When you say it is a citation, what is it? It's North Carolina Baptist Hospitals, Inc., v. Mitchell, 374 Southeast 2nd, 844, a 1988 case from the North Carolina Supreme Court. Okay, so this is the first time ever in this PTO action that you and Mr. Politis are presenting this opinion? I don't know, Your Honor. You don't know? That's why this case could have been mentioned by the North Carolina Bar Authorities to the Patent Office, saying, can you believe this guy? Okay. No, no, I'm asking you about what you are in control of, you and Mr. Politis are in control of. When is the first time that this opinion that I'm not aware of has been presented in this PTO action? Is it right here, right now by you? Right here, right now, Your Honor. Okay. And, again, it's in response to your question. I was not going to go into a lot of this. No, you were the one that brought it up. I didn't ask if there was a North Carolina State Supreme Court opinion that is relevant to this case. That was you. My point is that the U.S. PTO regulations require their attorneys to disclose exculpatory information. And I mentioned a wide range of PTOs. That was Rule 801 that you mentioned? 801, 401, 304. Okay, again, is that the first time that this has been mentioned by you and Mr. Politis in this PTO action? It is, but I would assume that the U.S. PTO attorneys who are handling disciplinary investigations know their ethical obligations. And knowing their ethical obligations, they would – Is Rule 801 a rule of professional conduct that applies to practitioners that are members of the patent bar? It is, Your Honor. Okay, so you're saying that that rule that applies to registered practitioners of the patent bar also applies to people that work for the Office of Enrollment and Discipline in how they handle disciplinary proceedings? The patent office admits that it does in official gazette notices. The director of the Office of Enrollment and Discipline has repeatedly stated in writing in the official gazette, notifying the public that an attorney employed by the United States Patent and Trademark Office is a practitioner that is responsible for compliance with these rules. And therefore, the attorneys, many of whom are here today, are responsible for determining whether a file contains exculpatory information when a disciplinary matter is pending before them, and for disclosing that to the defendant. Okay, did Judge Ellis have an opportunity to address this argument that you're raising now on appeal? Your Honor, he did not. But I would note that if this Court confines its analysis to the Brady v. Maryland case, it would lose the opportunity to do justice and evaluate other law that clearly applies to this circumstance. Why evaluate just Brady when, in fact, you can evaluate the other laws that's highly relevant to the issue at stake? You said there's an official gazette notice that says that all of these rules of ethics apply equally to PTO employees? That's right, and it's also in the rules. Where is that? I don't have that citation with me. I can supply it. But I would point the Court to the definitions contained in 37 C.F.R. 11.1, which defines practitioner as any attorney who has business before the patent and trademark office. If you look at those rules, they obviously, according to their clear and unambiguous language, encompass attorneys who are employed by the U.S. PTO. And that being the case, it's imperative for this Court to analyze those regulations and not confine itself to the Brady issue, because the Brady issue is just one aspect of many overlapping areas of law. Are you maintaining the Brady argument on appeal? I am. I am. With regard to the Brady argument, it's my position that the Supreme Court said when a liberty interest is at stake, exculpatory information must be disclosed to defense. This is the way I think of the Brady argument, because the Brady argument has been interpreted by, for example, the Maniac v. Petrovsky decision to apply to civil cases by the Ninth Circuit Court of Appeals. There are some criminal cases which- That was a very limited circumstance, wasn't it? It was. It was. It was. The real problem is the patent office. Has there been a refusal in North Carolina to disclose the contents of the file? I believe Mr. Politti's first step was to approach the patent office first, because those are pending proceedings. Okay, so they haven't been asked. Is that right? I'm not sure, Your Honor. I'm not sure. And is there, do we know, is there a time limit for such a proceeding? Even without penetrating the reason for this confession of wrongdoing, isn't a practitioner permitted to reapply for admission? He is, Your Honor. I think he has another two years before he's eligible to- Is there a five-year limit, is it? I'm not sure what the specifics of that North Carolina law are, Your Honor. But I can say Mr. Politti has told me he has another two years to go before he can reapply. Although, I believe under these circumstances, he may reapply on the basis that the original confession or surrender was inappropriate for a wide variety of reasons. Okay, let's hear from the other side, and we'll save you rebuttal time. Thank you, Your Honor. Ms. Kimball? Thank you, Your Honor. May it please the Court, I'm Assistant United States Attorney Kimmery Kimball here today on behalf of the United States Patent and Trademark Office. This is a matter in which the USPTO has imposed reciprocal discipline on Petitioner Appellant Richard Politti because he voluntarily and with the advice of counsel surrendered his North Carolina bar license. But it's not automatic. And in fact, I was surprised. I had thought it was automatic, but it's not automatic. So they do have, there are several criteria by which they can penetrate and reach an independent conclusion. And I think we have to assume that that's the basis on which we're here. Thank you, Your Honor. There are four bases on which the Patent and Trademark Office can decline to impose reciprocal discipline. But Mr. Politti presented none of those bases to the USPTO. None of these arguments were presented to the USPTO. He never asserted that the confession... He says he doesn't have the information because someone else has it. But, Your Honor, he surely at least had the information that he's relayed to Mr. Ficconi and that's being relayed here for the first time. This allegation that he only confessed because he was threatened with 20 years of imprisonment in a disciplinary proceeding, he's the one who has that information, not the Patent and Trademark Office. That's why it's his obligation to come forward and set forth some basis on which the North Carolina decision should not be imposed in the Patent and Trademark Office. The rest of his arguments are based on his assumption about what he thinks may be there, but there's no evidence that any of that is there. He had an attorney in the North Carolina proceeding. He had an attorney and he submitted an affidavit in which he testified to three things. He testified that he had noticed that the North Carolina State Bar Association intended to charge him with misuse of funds entrusted to him by a client. He testified that the material facts underlying that allegation were true. And he testified that if disciplinary charges were brought, he would not be able to defend against them. He wants to change all that before the PTO. How far, in your view, can that be taken? He would have to submit a response to the notice in which he explained how his allegations fit into one of the four criteria outlined by the Supreme Court in Selling v. Radford. How it was a due process violation or how there was a paucity of proof or something along those lines. But he would have to provide sufficient information that the USPTO director could determine that perhaps there was a due process violation. And if he had presented that information, then the USPTO director could have sent it on to a hearing before an ALJ. And then he could have received some discovery in this matter. But he presented none of these arguments to the USPTO. Yes, so that's a problem. Is it too late? Well, certainly in this proceeding, it's too late. It's now been three years since he submitted this confession to the North Carolina court where he testified that all of these things were true. So at this point, there's no basis on which to overturn the USPTO's decision that reciprocal discipline should be imposed. He can reapply to the USPTO after five years or he could potentially seek to overturn his disbarment in the North Carolina court. But at this point, I don't understand how he has established any of the criteria. He didn't even submit affidavits from the people who supposedly were told that he would be imprisoned for 20 years. I mean, he had control over all of that information and presented none of it to the USPTO. He never even suggested to the USPTO that he thought that they had an assignment that would have negated his allegations in the affidavit. None of that was submitted to the USPTO. He can't now, at the appellate stage, claim that the USPTO's decision was an error when he presented none of this before. He's waived all of these arguments. As such, the USPTO's decision, there's no error under selling and there's no basis for the USPTO not to have imposed discipline. And it's important to note that 37 CFR 1124 requires the USPTO to impose reciprocal discipline unless the petitioner establishes one of those criteria. The USPTO director had no authority to do anything other than impose reciprocal discipline when he failed to present any of these arguments to the USPTO. As such, the USPTO's decision was correct. I'd also like to address briefly Mr. Politi's arguments regarding 11.801. 11.801 appears to address issues of misapprehensions known by somebody, the correction of errors made to a tribunal. There's no indication here that the USPTO knew of any error made to a tribunal or failed to correct any such error. There were no factual statements made by Mr. Politi at all during the proceeding that the USPTO should have known to correct or failed to correct and they made no factual. What about his suggestion that there's something in the file that was provided from North Carolina to the PTO that would have somehow exonerated him or shown that the proceeding that occurred in North Carolina was incorrect? I mean, that I guess is the thing that he is suggesting is the knowingly false statement. So if the suggestion is that the USPTO had knowledge that the confession was false and... No, but the accusations that the $16,000 was really misappropriated, that is essentially probing into the facts. If the USPTO had knowledge that the $16,000 had been misappropriated, and then... I'm sorry, just so that I understand your question. I understand Mr. Politi's argument to be that there's something exculpatory in the file. Assuming for a minute that that's true, what is your response to that with respect to 11.801? I just want to dig in a little bit on that. If there were an actual false statement, then I think the USPTO attorney should correct that false statement. I'm not sure that... They wouldn't know it's false unless Mr. Politi sees what has been represented in North Carolina and says that's false, and then proves it's false, I'd say. In terms of the actual disciplinary proceeding at issue here, the only information actually submitted to the USPTO director pursuant to the regulations was the order disbarring him in the affidavit. So they would have to have knowledge that the affidavit was somehow false. So there was nothing else in the file? So in the file that begins the reciprocal disciplinary proceeding. There's nothing else that goes into the administrative file for this action. Counsel says he assumed the entire North Carolina dossier was transferred to the PTO. You're saying that, as far as you know, that's inaccurate? It's certainly not the entire file. Because the USPTO's statute of limitations continues to run, OED attorneys do continue to investigate these matters while the reciprocal disciplinary proceeding is continuing. So they may have additional information that never made it into the reciprocal disciplinary proceeding, because it's not pertinent to the reciprocal disciplinary proceeding. But that would be the OED attorneys, and then once the reciprocal disciplinary case begins, then the OED attorneys are no longer involved in that process. It wouldn't be pertinent if it's true, but if it's false, and in some material way, maybe it would be pertinent. But how is the PTO going to know that some sort of straightforward account is false unless there's an opportunity to say so? So Mr. Politi should be able to respond to that and say that these funds were never misappropriated. I know I testified to that, but I was wrong for these reasons. He has the opportunity to do that in a response to the USPTO. And had he done that and provided sufficient information in that response that the USPTO director determined that there was a genuine issue of material fact, then it can go on to a full hearing. I remember correctly that there was no response ever filed by Ms. Politi before the PTO. That's correct. That's why I asked if it's too late. And present counsel seems to have a more optimistic view than perhaps may have been available two years ago. The USPTO has already issued its decision, and reciprocal discipline has already been imposed. Well, that's why we're here. That's correct, Your Honor. And Mr. Politi can reapply for the USPTO in five years. Who is governed by Rule 801 and the other rules of professional conduct in that Chapter 37 CFR? Is it registered practitioners of the patent bar only, or is it registered practitioners of the patent bar plus the PTO's own employees? Honestly, Your Honor, I don't know. I had no knowledge that 37 CFR 801, 11801 would be part of this proceeding. But I'm happy to brief that for the Court. I don't know either. Do we need briefing on it? No, we don't. I don't think so. I think we're okay. If we need additional briefing, we'll ask you both. Okay. For all of these reasons, and specifically for the reason that Mr. Politi surrendered his bar license with the advice of counsel, and surrendered his bar license and specifically testified that he had committed the misconduct that was at issue in the proceeding, and that he had no defense to it, the USPTO's decision should be upheld. Thank you. Okay. Thank you, Ms. Kimball. You have two minutes. Your Honor, I just want to make a couple of extra points regarding Judge Chen's point. If you look at the definitions for practitioner, that term practitioner, in 37 CFR Part 11, it defines practitioner as any attorney with business before the Patent and Trademark Office. By the plain and unambiguous language of that regulation, it covers USPTO employees who are attorneys admitted to a state bar. In addition to that, the- Did you say any attorney who had business before the PTO? Yes, there was concern- So how would a PTO employee, him or herself, have business before the PTO? As employees of the Patent Office, they're involved with business before the Patent and Trademark Office. Well, we can assume that they have an obligation to fully perform their assignments ethically. I don't think that that's a problem, is it? I don't think so. To me, the language is very clear. Based on that and based on the application of these rules, then in circumstances where a practitioner undergoing disciplinary matters has documents that the Patent Office has received from third parties and where discovery is not a matter of right, neither is subpoena power in these proceedings. And the attorney undergoing the disciplinary proceedings requests exculpatory information. The Patent Office has a duty to go through its file and make sure that there is not a misapprehension, especially where Mr. Politti may not have specifically said, I'm innocent, but he did request extensions of time. During those extensions of time, he did request exculpatory information. I would hope that if I had someone in these proceedings before the Patent Office, that a Patent Office attorney would be willing to take the 15 minutes that it takes to go through and see if there's something that's obviously evidence, like an assignment, that the Patent Office received from another bar authority or evidence that a practitioner undergoing discipline is asking for. Because that evidence may inform the practitioner whether to fight those charges or not. And in this case, in view of the very clear duty covered by any number of Patent Office rules, by Virginia Rule of Professional Conduct 3.8D, which applies to USPTO attorneys too, and I would argue the Brady v. Maryland case, which some courts in civil cases, although narrow, have applied when there is sufficiently grievous taking by the government about to happen. But I don't think you've told us that the North Carolina state or bar examiners, whoever they are, refused to provide the accusations to Mr. Politti? I don't know what happened in that regard, Your Honor. I can't say whether Mr. Politti had requested those documents or not from the North Carolina bar. But I can say that when he is undergoing active disciplinary proceedings at the Patent Office, and these Patent Office regulations create an obligation for the USPTO attorneys to disclose exculpatory information, those attorneys charged with this important governmental function should search the file and come up with any evidence that's being requested. I would lastly note that if you look at any of the case law discussing the balancing tests that the Supreme Court says must be done to determine what processes do in disciplinary proceedings or in any grievous government taking, they always say, what is the government interest in the action? In this case, what is the government's interest in withholding exculpatory information when they have an obligation to disclose it? Why shouldn't the government have to come forward, meet their obligations under the regulations, and give the exculpatory evidence that's being requested by a practitioner undergoing these proceedings? Okay. Any more questions? Any more questions? Okay. Thank you. Thank you both. The case is taken under submission. Thank you. That concludes this afternoon's argument scheduled. All rise.